IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PAUL THOMAS GILLAM, | ) | |
| ID # 1724827 | ) | |
| Petitioner, | ) | |
| vs. | ) | No. 3:15-CV-2692-D-BH |
| | ) | |
| LORIE DAVIS, Director, | ) | Referred to U.S. Magistrate Judge |
| Texas Department of Criminal | ) | |
| Justice, Correctional Institutions Division, | ) | |
| Respondent. | ) | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3-251*, this habeas case has been referred for findings, conclusions, and recommendation. Based on the relevant findings and applicable law, the petition for writ of habeas corpus under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

## I.  BACKGROUND

Paul Thomas Gillam (Petitioner) challenges his conviction for murder. The respondent is Lorie Davis, Director of the Texas Department of Criminal Justice (TDCJ), Correctional Institutions Division (Respondent).

On June 8, 2010, the State indicted Petitioner for murder in Cause No. F10-47328. (Doc. 10-4 at 5.)[1] He pleaded not guilty and was tried before a jury in the 291st Judicial District Court of Dallas County, Texas, on June 14-17, 2011.

### A.  Trial[2]

Dana Swindle and John Gant had a three-year old daughter, Jaelyn. John's mother, Patricia

---

[1] Page citations refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

[2] The summary of the evidence at trial is taken from the state appellate court's opinion. *See Gillam v. State*, 05-11-01334-CR, 2013 WL 1628386 at *1-11 (Tex. App. – Dallas April 16, 2013).

Gant (Gant), took custody of her when Swindle went to prison on a drug charge. Gant was married to Petitioner. After Swindle was released from prison, she sought custody of Jaelyn.

Swindle began a romantic relationship with Melanee Knouse about five months before the murder. According to Knouse, in the week before the murder, a Dallas court awarded custody of Jaelyn to Swindle. The court believed Gant and Petitioner were living in Missouri. Swindle learned tht they were living on Amherst Drive in Rowlett, Texas. Swindle contacted authorities and provided that information, but "there was nothing they could do." A few days before the murder, Knouse went with Swindle to the Rowlett police station, where Swindle filed a report alleging interference with a custody agreement. Although Swindle had obtained an order that allowed her custody of Jaelyn on approximately April 14, 2010, on April 22, 2010, a Dallas court had put the order awarding custody of Jaelyn to Swindle on hold for a future hearing. Later that same day, Knouse and Swindle went to Petitioner's house to take photographs to prove that he and Gant lived in Texas, and not in Missouri. Knouse drove slowly down Amherst Drive in her truck while Swindle took photographs of Petitioner's house with her cell phone from the front passenger seat. Knouse and Swindle asked a man if a lady, a man, and child lived in that house, but he did not answer. Because the road came to a dead end, Knouse began turning around. At that point, Petitioner pulled up in his truck and parked in the driveway of the house. Swindle continued taking photographs from the passenger seat. The man went and spoke with Petitioner.

Petitioner "came at" them while they were in the truck. He told them that they had no right to take photographs of the house, reached through the window, scuffled with Swindle, and took her cell phone. He then walked away and went into the house.

As Petitioner walked away, Swindle got out of the truck and asked two men standing nearby

if she could use a cell phone to call 911. Knouse could not recall whether Swindle said anything to Petitioner after getting out of the truck, other than telling him she was calling 911. Swindle stood in the yard of the house next door to Petitioner's and placed a 911 call. She was not standing on Petitioner's property. While she was talking on the phone, Petitioner came out the front door of his house and headed toward her. According to Knouse, Petitioner was "just kind of walking." Swindle turned around, told him to stop, and said that she was on the phone with 911. Then, Swindle turned back around to talk on the phone. Petitioner pulled a gun from behind his back and shot Swindle several times. After the second or third shot, Swindle fell to the ground face-first. Petitioner shot Swindle two or three more times while she was on the ground. Petitioner turned and went back toward his front door. Knouse stated that Swindle did not threaten anyone and did not have a gun.

Phillip Parker testified that at the time of the offense, he lived about two doors down from Petitioner on Amherst Drive. He had seen Petitioner occasionally with a little girl. On April 22, 2010, Parker was asked by Swindle whether he knew anything about the people living in Petitioner's house. He answered that he had seen them a couple of times. Swindle left and he went into his house. Then, he came back out and saw Swindle and another woman returning. Swindle was taking photographs of Petitioner's house.

At that point, Petitioner came home. Parker told Petitioner about the two women taking photographs. Petitioner asked Parker what they were driving. Parker pointed out the vehicle to him. Petitioner went over to the women, hit Swindle, and took a phone from her. Parker did not hear Petitioner say anything to the women. Swindle asked Petitioner what he was doing and told him, "You can't do that." Petitioner walked into his house. Parker heard Swindle tell Petitioner that she wanted her phone back. He did not hear Swindle say anything else.

3

Swindle got out of the car, ran over to where Parker was standing with his neighbor, Cory Gayford, and asked to use a cell phone. Gayford gave Swindle a cell phone and she called the police. Petitioner came back outside and walked over to Swindle. She was talking to police on the phone. Petitioner said, "[W]ell, you ain't got to worry about it no more." Petitioner pulled out a gun and shot Swindle in the arm. Petitioner was about four or five feet from her. She started to run away and he shot her again in the top of the back. She fell down and he walked to her and shot her more times. Parker asked Petitioner, "[W]hat are you doing?" Petitioner looked at him, then walked back toward his house. Parker testified that it did not seem to him at any time that Petitioner was in danger of being hurt by Swindle.

Cory Gayford testified that he lived on Amherst Drive in Rowlett at the time of the offense. On April 22, 2010, Parker told Petitioner about a woman taking photographs of Petitioner's house. Then she returned. Petitioner went to her vehicle and started arguing with her. She did not yell anything to Petitioner before he approached the vehicle. They started fighting over a phone. Petitioner seemed angry. He wrestled with Swindle and appeared to strike her several times. He walked back toward his house with the phone in his hand. Swindle left the vehicle and approached Gayford and Parker to ask to use a cell phone. Gayford gave her his cell phone and she called the police. While she was on the phone, Petitioner approached her from his house. She told him, "I just want my kid back," and he replied, "[Y]ou don't have to worry about that no more." Petitioner reached behind his back and pulled a gun out from his pants. He shot her in the arm and then in the back. She fell to the ground and he shot her several more times. Gayford testified that it did not seem to him that Petitioner was in danger from Swindle at the time he began shooting.

Guadalupe Christensen testified that on April 22, 2010, she was in the yard of her home on

4

Stanford Street in Rowlett, which intersects with Amherst. She heard a commotion across the street. She heard loud voices, but could not make out the words that were being said. She saw Petitioner pull up in front of his house in his truck at the same time a vehicle pulled up in front of a different house. Petitioner went into his house. Swindle got out of the vehicle and asked some people standing nearby if she could borrow a cell phone. Petitioner came back out of his house a short time later with a gun. Swindle was talking on the phone. Petitioner said something to her, shot her about five times, and went back into his house. Christensen testified that she did not see Swindle attack Petitioner or go toward him.

Officer Shawn Fuller arrived at the scene. He saw Swindle lying beneath a tree, bleeding. He was told that the shooter had gone into his house. He was also told that the suspect had gone into the alley and that he still had a gun in his hand. Fuller and a detective approached the front door of Petitioner's house and announced themselves. The door was opened by Gant. She gave them consent to enter and search the house. Fuller saw an empty holster and a cell phone on the floor in a bedroom. Gant and Jaelyn were the only people in the house.

Rowlett Chief of Police Matt Walling testified that when he heard the report of the shooting, he and a lieutenant headed to the general location to see if they could locate the suspect. Not far from the scene they saw Petitioner walking toward them from the direction of a nearby lake. He was wearing hospital scrub pants and a white t-shirt. Walling asked him if he knew why they were there, and Petitioner responded "yes." Petitioner said that he was just out jogging. Walling and the lieutenant detained and handcuffed Petitioner.

After Petitioner was found, Fuller and other officers searched for evidence along the pathway they believed Petitioner had taken after the shooting. In some bushes near the lake at a nearby park,

they found a blue scrub-top, which matched the description of what Petitioner had been wearing.

Dr. Reade Quinton, a medical examiner for Dallas County, testified that he conducted an autopsy on Swindle on April 23, 2010. The cause of death was multiple gunshot wounds. There were five gunshot wounds on the body: one on the left shoulder, one on the right side of the abdomen, one through the right side of the back and the right arm, and two on the back. The entry wound on the left shoulder was from the front, and the other four entry wounds were from the back. Two of the wounds went through Swindle's heart and either one of those would have caused death very quickly. Swindle tested negative for drugs and alcohol.

Photographs from the autopsy were admitted into evidence over Petitioner's objection. Also over his objections, an audio recording of Swindle's 911 call was admitted into evidence and played for the jury. Photographs taken at the scene before and after the shooting were alos admitted into evidence, including a photograph of Petitioner's residence, and several photographs of the yard of the house next door where Swindle was standing when she was shot.

David Waters, a detective with the Rowlett Police Department, testified that prior to April 22, 2010, he spoke with Swindle more than once about custody issues involving Gant and Petitioner. Approximately a year before the shooting, Swindle contacted him because she wanted to file charges based on an altercation between her and Gant. No charges were filed regarding that incident. Waters did not proceed with charges regarding other custody complaints by Swindle because he was waiting for the family civil courts to resolve those custody issues. On April 22, 2010, he met with Swindle and recommended that she not go to Petitioner's house and that she avoid any conflict.

Patricia Gant testified and her son and Swindle lived with her and Petitioner intermittently until summer 2007. Gant received full custody of Jaelyn when Swindle was arrested in November

2008. Swindle was released in April 2009, but Gant continued to raise Jaelyn. Swindle was allowed supervised visits. In March 2010, Gant learned that Swindle was seeking custody of Jaelyn.

The State objected to Gant's testimony pertaining to her relationship and interactions with Swindle on the grounds of relevance and hearsay. Outside the presence of the jury, the court heard argument as to the admissibility of the evidence, which included Gant's testimony about (1) a 2009 pushing incident involving Gant and Swindle, (2) a death threat made by Swindle to Gant during a phone call in 2009, (3) drug use by Swindle reported to Gant by another person, (4) Swindle spending time with people of dangerous character, and (5) Swindle driving down the alley behind Gant's house several times with a person who had a criminal history. Defense counsel asserted in part that the testimony was admissible under (1) Texas Rule of Evidence 404 because it was "evidence of a character trait of the victim of the crime offered by an accused," and (2) article 38.36 of the Texas Code of Criminal Procedure because the testimony described the family dynamics in the situation and went to Petitioner's state of mind. Defense counsel also argued that the theory of self-defense had been raised by the evidence. The court ruled that the 2009 pushing incident described by Gant was admissible. The court sustained the State's hearsay objection as to anything Gant heard from other people and ruled that the other evidence was not admissible at that point because it concerned the state of mind of Gant, and not Petitioner. The court stated that self-defense had not been raised by the evidence at that point, but that it would be reconsidered if other evidence was presented on the matter.

Gant testified that in 2009, there was a physical confrontation between her and Swindle and the police were called. She felt threatened by Swindle at that time. In July 2009, Gant and Petitioner moved to Missouri. They moved back to Texas in February 2010, and lived on Amherst

in Rowlett.

In April 2010, she learned that a judge had awarded Swindle custody of Jaelyn, who was still living with Gant and Petitioner. Gant was surprised because she had not received notice of any custody hearing. She contacted a lawyer and challenged the custody order. She and Petitioner were constantly worried and could not eat or sleep well due to stress from the custody matter.

On April 22, 2010, she called Petitioner at his work place and told him that a stay had been granted on the custody order. She was upset because she thought that the stay meant that Swindle had custody of Jaelyn. Petitioner sounded upset on the phone. When he came in the house after work, he was very upset. He looked physically pale, scared, and crazy. She had never seen him like that, and she knew that something was wrong. He immediately went into a room and came out with what she thought might be a gun. He ran out the door. Gant called 911. She was afraid because she did not know what was happening.

Timothy Lucius, Petitioner's supervisor at the Mesquite Specialty Hospital, testified that he was generally very helpful and respectful and was one of his best workers. Sometime in the morning on April 22, 2010, Petitioner appeared to be very disturbed and distraught, and he was breathing fast and was clammy and sweating. Lucius had not seen Petitioner that way before, and it appeared that Petitioner was very anxious to get home. He told Petitioner that he could not let him leave right away because he did not feel safe about letting him on the road at that time due to his behavior. He gave Petitioner something to drink and told him to rest a little bit. Petitioner left about fifteen minutes later.

Petitioner testified that he worked at Mesquite Specialty Hospital assisting nurses with patient care at the time of the shooting. When Swindle lived with him and Gant, there was

contention between them. They took over the care and raising of Jaelyn after Swindle was incarcerated in 2008. When she was released, he was worried about her ability to care for Jaelyn based on her history and behavior. He feared violence by Swindle against Gant based on the 2009 altercation based on information from Gant that the trial court did not allow him to elaborate on. He felt that there was a likelihood of a confrontation between Gant and Swindle. If there was a confrontation, Gant "would be at the losing end," and he worried about her well-being and safety.

In April 2010, Petitioner and Gant discovered that there had been a hearing, and that Swindle had been given sole managing custody. They were shocked because they had received no notice of the hearing. He felt that the custody order had been obtained through fraudulent means. They immediately contacted their attorney. After the custody order was issued, he spoke with Swindle by phone several times regarding custody of Jaelyn, and Swindle seemed angry and belligerent. He felt lost, powerless, anxious, uncertain, and hopeless. He had difficulty sleeping and had terrible dreams. He became reclusive and was constantly worried about Jaelyn's well-being. He was taking Chantix, a drug to help him stop smoking.

While he was at work on April 22, 2010, he received a phone call from Gant, who was crying. After the call ended, he believed he was having an anxiety attack. He told his supervisor that he had an emergency at home and that he needed to leave.

When he pulled into the driveway at his home, he saw two young men standing in his yard. He had a conversation with them that caused him concern and caused him to fear for his wife. One of the men pointed, and Petitioner turned around and saw a vehicle parked near the front of his house. Swindle was in the vehicle doing something with her phone and someone else was driving. Petitioner was in shock and angry. He was in fear for Gant's safety and of losing the baby. He

9

approached the vehicle and yelled at Swindle to stop taking pictures and to leave, but she did not leave. They struggled over her phone, and he discovered that she had been taking photographs of him and his family. After taking her phone, he walked away from the vehicle. She stepped out of the vehicle and into his yard and said, "Give me my phone back you son-of-a-bitch." She also said, "I'm taking Jaelyn. I'm taking my daughter." He looked at the photographs of his vehicles and house on her cell phone as he walked toward his front door. Everything felt surreal and like a dream to him. He went into his house and grabbed the weapon. He felt like a robot. He went back outside. Nothing felt real to him. He leveled the gun and "fired, and fired, and fired." He felt that he was protecting his wife and the baby and was "just reacting."

On cross-examination, Petitioner testified he did not know whether he intended to kill Swindle and did not know that he fired five times. He thought that Swindle being on his property or even near his house was a threat. After shooting her, he walked through his house to his back yard. Then, he just walked and found himself at the lake. He thought that he left the gun on a planter in his back yard before he walked toward the lake.

Following Petitioner's testimony, the trial court held a hearing outside the presence of the jury to determine the admissibility of the testimony of Dr. Ray McClung, a clinical psychologist appointed by the trial court to evaluate Petitioner. Defense counsel asserted that McClung's testimony was being offered under article 38.36(a) and (b)(2) of the Texas Code of Criminal Procedure to "shed light on the condition of the defendant's state of mind at the time of the offense as related to his family and domestic issues that he had and his wife had with [Swindle], the victim, in this case because of prior activities of [Swindle], threats of [Swindle], that played into the condition of my client's state of mind at the time of the event that took place, and directly relates

10

to his defensive mechanism to protect his wife and child."

After hearing a summary of McClung's proffered testimony, including testimony that Chantix can cause violent behavior in some users, the trial court ruled that McClung's testimony would not be allowed during the guilt/innocence phase of trial. The trial court ruled that if Petitioner were found guilty, McClung's testimony would be allowed during the punishment phase on the issues of mitigation and sudden passion.

At that point in the trial, counsel for Petitioner re-offered Gant's testimony that had been excluded earlier regarding the death threat made by Swindle to Gant in 2009. The trial court overruled the State's objection, and Gant was recalled as a witness.

Gant testified that in approximately May 2009, she had a heated phone conversation with Swindle. Swindle said that Gant had no right to have Jaelyn, and she told Gant that she was going to get her daughter back. Swindle also told Gant that she would kill her in order to get Jaelyn back. Gant felt concern and fear and told Petitioner about the conversation. On cross-examination, Gant testified that she reported Swindle's assault against her to Swindle's probation officer, but that she did not tell Swindle's probation officer about the threatening phone call.

On rebuttal, United States Probation Officer (USPO) Myra Kirkwood, from the Eastern District of Texas, Plano Division, testified that she met Swindle in 2005 when Swindle began a term of supervised release and began reporting to that office. She supervised Swindle's probation officer, Tiffany Rutt, and accompanied Rutt as she visited Swindle in the community. Swindle never tested positive for any illicit drug. Gant called the probation office several times to report drug use by Swindle, but Swindle tested negative each time. Kirkwood did not have any concerns about issues of aggression or violence with Swindle. In May 2009, the probation office received phone calls

from both Gant and Swindle about an altercation between the two of them that had been reported to Rowlett police.  Other than that, she had not received any reports of Swindle being violent.  Gant never told Kirkwood that Swindle had threatened to kill her.

Swindle was assigned to a halfway house during her probation because of her inability to maintain stable employment.  An incident at the halfway house involving technical violations of probation was reported to a judge, and she was ordered to enter an inpatient treatment program.  She self-disclosed some alcohol issues, episodic use of cocaine with John Gant, and abuse of prescription medication.  During her probation, she was arrested for public lewdness and received probation.  In early April 2010, Kirkwood had a pleasant conversation with Swindle in which she stated that her number one priority was to try to get all of her children together.

The trial court denied Petitioner's request for a jury instruction on defense of a third person.  The jury convicted Petitioner of murder.  (Doc. 10-4 at 49.)

## B.    Punishment Phase

At the punishment phase, Dr. McClung testified that he performed a mental health evaluation on Petitioner after the shooting.  Petitioner was "very depressed" with a "history of someone who has been depressed for years," and he had "a generalized anxiety disorder."  His father was an alcoholic who was abusive to him, his brother, and his mother, and Petitioner had taken on the role of a protector.  Petitioner avoided any kind of confrontation, but he could be aggressive when provoked.  McClung thought the risk he would be a future danger to the community was low.

Petitioner had been using Chantix to help him stop smoking, and according to McClung, "one of the outcomes that very often does happen when somebody takes this medication is they do get violent."  He believed that Chantix played a role in Petitioner's mental and emotional state at the

12

time of the shooting. On that date, Petitioner felt violated and terrified as a result of Swindle's actions and words. Becoming a father to Jaelyn had made a "tremendous difference" in his life and given it purpose. He "greatly feared" that he and Gant would lose Jaelyn "to a situation in which there wouldn't be a good outcome," and he could see nothing else to do other than take some sort of action. McClung testified, "I think at that point, once he had the gun, I think—I think any real clear thinking was just not part of him," and that he was unable to act rationally at that point and was definitely acting on impulse. McClung opined that Petitioner was sincerely remorseful.

The jury found that Petitioner did not act under the immediate influence of sudden passion arising from adequate cause, and he received a sentence of 65 years' imprisonment. (Doc. 10-4 at 53-54.)

### C.    **Post-conviction Proceedings**

The judgment was affirmed on appeal. *Gillam*, 2013 WL 1628386. His petition for discretionary review was refused. *Gillam v. State*, PD-820-13 (Tex. Crim. App. Aug. 21, 2013). He did not file a petition for writ of certiorari. Petitioner's state habeas application, signed on November 7, 2014, was received by the state court on November 17, 2014. (Doc. 10-14 at 6, 22.) On July 29, 2015, the Texas Court of Criminal Appeals denied the application without written order. (Doc. 10-13); *see Ex parte Gillam*, No. WR-83,410-01 (Tex. Crim. App. July 29, 2015).

### D.    **Substantive Claims**

Petitioner's habeas petition, signed on August 1, 2015, and received on August 18, 2015, raises the following grounds:

(1) Trial counsel was ineffective because he:

(a) failed to subpoena the victim's probation case file and her probation officer;

13

(b) failed to subpoena Detective Keith Needham who had knowledge of calls to the police by Petitioner and his wife regarding the victim's aggressive behaviour;

(c) failed to ensure that the jurors were diverse and impartial;

(d) failed to object to the victim's family talking with jurors during breaks in the trial;

(e) failed to subpoena phone records of Petitioner, his wife, and the victim;

(f) failed to object to Detective Fuller's testimony about his theory regarding where Petitioner stored his handgun;

(g) failed to object to the prosecutor's distorting of the facts about an Arizona misdemeanor offense;

(h) failed to recall witnesses Gayford and Parker;

(i) failed to subpoena a paralegal about a conversation between the victim and her lawyer;

(j) failed to object to the jury being allowed to observe Petitioner in shackles;

(k) failed to object to outbursts by the victim's mother during trial and to obnoxious noises made by the victim's brother during Petitioner's testimony;

(l) failed to present a defense of temporary insanity;

(m) failed to call Gary Meyers and David Schwartz in support of the defensive theory;

(n) failed to have Petitioner verify his application for probation;

(o) failed to articulate that Petitioner was mentally ill at the time of the offense and suffered from diminished capacity;

(p) failed to articulate facts regarding the victim's previous violence against Petitioner's wife;

(q) failed to object to the jury charge regarding unanimity about sudden passion;

(2) The trial court erred by:

(a) allowing the victim's family to make outbursts during Petitioner's testimony;

14

(b) excusing a potential juror for having non-refundable airplane tickets;

(c) overruling his objection to Question 5 on the juror questionnaire;

(d) overruling his objection to the jury venire's defining of the law of the case;

(e) overruling his hearsay objection to the playing of a 911 call and ruling that the victim's statement during the call was a dying declaration;

(f) not allowing him to present evidence regarding the reason the victim went to prison, her history of drug abuse, and her consorting with violent felons;

(g) overruling his objection to the admission of autopsy photographs;

(h) not allowing him to present testimony of Petitioner's wife;

(i) not allowing testimony of Dr. McClung, a clinical psychologist;

(j) overruling his request for a jury instruction on self defense;

(k) granting the State's request for a jury instruction on voluntary intoxication;

(l) submitting jury instructions in which two paragraphs were contradictory;

(m) failing to enter a judgment in Petitioner's favor on the issue of sudden passion, notwithstanding the jury's verdict;

(n) failing to instruct the jury that unanimity was required on the issue of sudden passion;

(3) Appellate counsel was ineffective because he:

(a) failed to discuss article 38.36 of the Texas Code of Criminal Procedure regarding his fourth ground on appeal;

(b) failed to identify specific testimony that was excluded;

(c) failed to determine that trial counsel requested an instruction on defense of a third person but not on self-defense;

(d) failed to cite to the record and show how the arguments pertained to the issue regarding the exclusion of Dr. McClung's testimony;

15

(4)  There was improper jury argument when the prosecutor:

    (a) interjected her opinion in closing argument that the jury should not get caught up in the "cat and mouse" games of Petitioner;

    (b) argued that if the jury found that he acted in sudden passion, Petitioner would say that Dallas County did not care and that he received the minimum sentence.

(5) His right to due process was violated when the victim's family spoke with jurors during breaks in the trial.

(Doc. 3 at 6-15.) Respondent filed a response to the petition on January 7, 2016.  (Doc. 14.) Petitioner filed a reply on March 29, 2016 (doc. 22) and a supplement to the reply on October 28, 2016 (doc. 26).

## II.  APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because Petitioner filed his petition after its effective date, the Act applies.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to

procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established federal law within the meaning of § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). As for the "unreasonable application" standard, a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; accord *Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III. STATUTE OF LIMITATIONS

One of the major changes made to the way federal courts handle habeas corpus actions by AEDPA is a one-year statute of limitations.  *See* 28 U.S.C. § 2244(d)(1). The one-year period is calculated from the latest of either:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*See id.* § 2244(d)(1)(A)-(D).

Here, the facts supporting Petitioner's claims either became known or could have become known prior to the date his judgment became final.  The one-year statute of limitations is therefore calculated from the date his conviction became final. The petition for discretionary review was refused on August 21, 2013.  *Gillam v. State*, No. PD-820-13.  Because Petitioner did not file a petitioner for writ of certiorari with the United States Supreme Court, his conviction became final on November 19, 2013, when the ninety-day period for filing a petition for writ of certiorari expired. *See Flanagan v. Johnson*, 154 F.3d 196, 197 (5th Cir. 1998) (citing *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994)).  Accordingly, he had until November 19, 2014, to file his federal habeas petition absent any tolling of the statute of limitations.

A.    **Filing Date**

Petitioner initially claimed that he placed his federal habeas petition in the prison mail system on August 1, 2015.  (Doc. 3 at 19; doc. 22 at 16-17.)  He subsequently stated that  he received notice on August 12, 2015, that his state habeas application had been denied on July 29, 2015, and he mailed his federal petition the next day, on August 13, 2015.  (Doc. 26 at 3.)

Respondent provided the prison mail logs for outgoing legal mail and mail to courts for the period from July 29, 2015, through August 18, 2015.  (Doc. 14-2.)  The mail logs do not show that Petitioner submitted any mail to this Court during that period.  The envelope in which his federal habeas petition was mailed was postmarked August 13, 2015, from zip code 77478, a Houston-area zip code.  (Doc. 3 at 20.)  Petitioner is incarcerated in the TDCJ Michael Unit, which is in Tennessee Colony, Texas.

Rule 3(d) of the Rules Governing Section 2254 Cases, the "mailbox rule," provides that "[a] paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing.  If an institution has a system designed for legal mail, the inmate must use that system to receive the benefit of this rule."  *See Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999) (recognizing that prisoners file their federal pleadings when they place them in the prison mail system).  The mailbox rule does not apply if an inmate mails a habeas petition to a third party to mail to the court.  *See Driscoll v. Thaler*, No. 4:12-CV-330, 2012 WL 3656296 at *1 n.2 (N.D. Tex. Aug. 27, 2012) (mailbox rule does not apply if an inmate sends a petition to a third party to file with the court); *see also Dison v. Whitley*, 20 F.3d 185, 187 (5th Cir. 1994) (the mailbox rule does not apply when an inmate delivers his filing to an agent); *Gray v. Thaler*, No. 3:09-CV-0304, 2009 WL 3614458, at *3 (N.D. Tex. Oct. 30, 2009) (mailbox rule does

not apply to habeas petitions filed by a friend or family member).

Because the prison mail longs do not show any mailing by Petitioner, and the postmark on the envelope shows that it was mailed from a different zip code, he is not entitled to the benefit of the mailbox rule. *See Griffith v. Davis*, No. 3:15-CV-1282, 2016 WL 8285809 at *2 (N.D. Tex. Oct. 26, 2016) (inmate was not entitled to the mailbox rule where prison logs did not show that he mailed anything to the court during the relevant time period and the postmark was from Houston, Texas, but the inmate was incarcerated in Huntsville, Texas), *recommendation adopted*, 2017 WL 661398 (N.D. Tex. Feb. 17, 2017); *see also Causey v. Cain*, 450 F.3d 601, 604 (5th Cir. 2006) ("Because reference to prison mail logs will generally be a straightforward inquiry, making filing turn on the date the pro se prisoner delivers the notice to prison authorities for mailing is a bright-line rule, not an uncertain one."). The date of filing is therefore August, 18, 2015, the date that it was received by the Court. A literal application of § 2244(d)(1)(A) renders the § 2254 petition untimely.

**B.    Statutory Tolling**

Section 2244 mandates that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending *shall not be counted toward any period of limitation under this subsection*." 28 U.S.C. § 2244(d)(2) (emphasis added).

Petitioner's state habeas application was signed on November 7, 2014, the day he contends he placed it in the prison mail system. *See Richards v. Thaler*, 710 F.3d 573, 578-79 (5th Cir. 2013) (pro se prisoner's state habeas application is constructively filed for purposes of AEDPA when the prisoner delivers the papers to prison authorities for mailing to the district court). It was postmarked on November 12, 2014, from zip code 77083, which is in the Houston area, and received on

20

November 17, 2014. (Doc. 22 at 15-16.) Respondent has provided a copy of Petitioner's mail logs for outgoing legal mail and mail to courts for the period from November 6, 2014, through November 17, 2014. (Doc. 14-1.) The mail logs do not show that Petitioner submitted any mail to courts during that period. He is therefore not entitled to the benefit of the mailbox rule, and the date of filing for the state habeas application was November 17, 2014, the date that it was received by the state court. *See Griffith v. Davis*, 2016 WL 8285809 at *2.

The state habeas application was denied on July 29, 2015. The limitations period was tolled for 255 days while that application was pending, which made the § 2254 petition due no later than August 1, 2015. Because August 1, 2015, was a Saturday, the petition was due on Monday, August 3, 2015. *See* Fed. R. Civ. P. Rule 6(a)(1)(C) (if the last day of a period falls on a Saturday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday). The § 2254 petition was filed on August 18, 2015, which was after the limitations period expired. Statutory tolling therefore does not save the petition.

Even if Petitioner were given the benefit of the mailbox rule for his state and federal pleadings, his federal petition would be time-barred. If he mailed his state habeas application on November 7, 2015, using the prison mailing system, that application was pending 265 days, making his federal petition due on August 11, 2015. He states that he did not receive notice of the denial of his state habeas application until August 12, 2015, and he mailed his federal petition the next day on August 13, 2015. The limitations period had already expired on August 11, 2015, and his federal petition was untimely, even if he was given the benefit of the mailbox rule.

## C.  **Equitable Tolling**

AEDPA's one-year statutory deadline is not a jurisdictional bar and can, in appropriate

21

exceptional circumstances, be equitably tolled. *Holland v. Florida*, 560 U.S. 631 (2010); *Davis v. Johnson*, 158 F.3d 806, 810-11 (5th Cir. 1998); *cf. Felder v. Johnson*, 204 F.3d 168, 170-71 (5th Cir. 2000) (only "rare and exceptional circumstances" warrant equitable tolling). "The doctrine of equitable tolling preserves a [party's] claims when strict application of the statute of limitations would be inequitable." *Davis*, 158 F.3d at 810 (quoting *Lambert v. United States*, 44 F.3d 296, 298 (5th Cir. 1995)). It "applies principally where [one party] is actively misled by the [other party] about the cause of action or is prevented in some extraordinary way from asserting his rights." *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999) (quoting *Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996)). A habeas petitioner is entitled to equitable tolling only if he shows that: 1) he has been pursuing his rights diligently, and 2) some extraordinary circumstance prevented a timely filing. *Holland*, 560 U.S. at 649, citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). He bears the burden to show entitlement to equitable tolling. *Phillips v. Donnelly*, 223 F.3d 797, 797 (5th Cir. 2000) (per curiam). Courts must examine each case in order to determine if there are sufficient exceptional circumstances that warrant equitable tolling. *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999). The Fifth Circuit has also stated that when a prisoner contends that his ability to file a federal habeas petition has been affected by a state proceeding, the court should look at the facts to determine whether equitable tolling is warranted. *Coleman*, 184 F.3d at 402.

Petitioner argues that he is entitled to equitable tolling because he was not notified of the denial of his state habeas application until August 12, 2015, and he mailed his federal habeas petition the next day, on August 13, 2015.

A long delay in receiving notice of state court action may warrant equitable tolling. *See Hardy v. Quarterman*, 577 F.3d 596, 598 (5th Cir. 2009); *Phillips v. Donnelly*, 216 F.3d 508, 511

(5th Cir. 2000) (a substantial delay of several months in receiving notice of state court action may warrant equitable tolling).  To warrant equitable tolling under such circumstances, a petitioner must show that he pursued the state habeas process with "diligence and alacrity" both before and after receiving notification.  *Id.*  In *Hardy*, the court found that the petitioner was entitled to equitable tolling because he filed his state habeas application almost two months after his conviction became final, he was not notified of the denial of his state habeas application until almost one year after it was denied, and he unsuccessfully inquired about the status of the state habeas case eleven months after he filed his state application.  *Id.* at 599-600.

Here, the delay of two weeks in receiving notice of the denial of the state habeas application was neither long nor substantial.  *Elias v. Davis*, 212 F. Supp. 3d 688, 706 (W.D. Tex. 2016) (no equitable tolling for one week delay in receiving notice of denial of state habeas application); *Cecil v. Director*, No. 6:11cv699, 2012 WL 369210 at *3 (E.D. Tex. Jan. 19, 2012), *recommendation adopted*, 2012 WL 369178 (E.D. Tex. Feb. 2, 2012) (no equitable tolling where the delay in receiving notice of state habeas application was one week). Petitioner was not diligent because he filed his state habeas application almost one year after his conviction became final.  *See Nelms v. Johnson*, 51 F. App'x 482 (5th Cir. 2002) (no equitable tolling for delay where petitioner filed his state habeas application 317 days after the conviction became final; "[t]his court has found no case in which equitable tolling was granted after a petitioner had let ten months of the AEDPA limitations period slip by"); *Cecil*, 2012 WL 369210 at *3 (no equitable tolling where the petitioner waited almost one year before filing the state application).  Because Petitioner is not entitled to equitable tolling, his federal habeas petition is untimely.  In an abundance of caution, however, his claims will also be addressed on the merits.

## IV.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In his first ground, Petitioner contends that his trial counsel rendered ineffective assistance in numerous respects.

The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. art. VI.  The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel, both at trial and on appeal.  *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  To successfully state a claim of ineffective assistance of counsel, the prisoner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced his or her defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A failure to establish either prong of the *Strickland* test requires a finding that counsel's performance was constitutionally effective.  *See* 466 U.S. at 696.  The Court may address the prongs in any order.  *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

In determining whether counsel's performance is deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  *Id.* at 691. To establish prejudice, a Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (inquiry focuses on whether counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair).

24

Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent counsel's alleged errors. *Strickland*, 466 U.S. at 695-96.

To show prejudice in the sentencing context, the Petitioner must demonstrate that the alleged deficiency of counsel created a reasonable probability that his or her sentence would have been less harsh. *See Glover v. United States*, 531 U.S. 198, 200 (2001) (holding "that if an increased prison term did flow from an error [of counsel] the petitioner has established *Strickland* prejudice"). One cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Conclusory allegations are insufficient to obtain relief under § 2255. *United States v. Woods*, 870 F.2d 285, 288 n.3 (5th Cir. 1989); *United States v. Daniels*, 12 F. Supp. 2d 568, 575-76 (N.D. Tex. 1998); *see also Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (holding that "conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding").

A.    **Evidence of Swindle's Past Behavior**

Petitioner contends that counsel failed to subpoena Swindle's probation case file and her probation officer to show that she violated conditions of her probation, associated with violent offenders, and engaged in lewd and lascivious conduct in public with a violent felon who possessed deadly weapons. He also claims that counsel failed to subpoena Detective Keith Needham, who had knowledge of Petitioner's and Gant's calls regarding Swindle's aggressive behavior, or the phone records for Petitioner, Gant, and Swindle. He contends that counsel failed to articulate facts regarding Swindle's previous violence against Gant, and that this would have demonstrated the tumultuous environment and the extent of the harassment endured by Petitioner and Gant prior to

the shooting.

Claims of uncalled witnesses are not favored in habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy, and allegations of what a witness would have stated are largely speculative. *Day v. Quarterman*, 566 F3d 527, 538 (5th Cir. 2009). To prevail on an ineffective assistance claim based on counsel's failure to call a witness, a petitioner must name the witness, demonstrate that the witness was available to testify and would have, set out the content of the proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id.*

Evidence was presented at trial that Swindle committed technical violations of her probation while she was in a halfway house, and that she was ordered to enter an inpatient treatment program because of those violations. While on probation, Swindle disclosed some alcohol issues, episodic use of cocaine with John Gant, and abuse of prescription medication; she was also arrested for public lewdness, for which she received probation. Petitioner has not shown that the probation officer and Detective Needham would have been available to testify. He has not identified the factual details about the nature of Swindle's probation violations, her associations with violent offenders, and her engagement in lewd and lascivious conduct in public with a violent felon to which they would have testified and that counsel should have presented as evidence. He does not allege what the phone records would have shown. He has not shown that the testimony or records would have affected the outcome of the trial.

Counsel presented evidence about a heated phone conversation between Gant and Swindle in approximately May 2009. Swindle said that Gant had no right to have Jaelyn, that she was going to get her daughter back, and that she would kill Gant in order to get Jaelyn back. Gant felt concern

and fear and told Petitioner about the conversation. Gant testified that in 2009, there was a physical confrontation between her and Swindle and the police were called. Gant felt threatened by Swindle at that time. Gant reported Swindle's assault to her probation officer, but she did not tell the probation officer about the threatening phone call. After the custody order was issued, Petitioner spoke with Swindle by phone several times regarding custody of Jaelyn, and Swindle seemed angry and belligerent. Petitioner does not allege any specific facts that counsel failed to articulate or present as evidence regarding Swindle's previous violence against Gant, and he has not shown that any other additional evidence about it would have affected the outcome of the trial.

Petitioner has not shown that the state court's rejection of this claim was unreasonable.

## B.  <u>Diversity of Jury</u>

Petitioner contends that counsel failed to ensure that the jurors were diverse and impartial. He asserts that the jury was comprised of eleven women and one man who were the same age and race as Swindle.

Petitioner does not contend that the State exercised its peremptory challenges in a discriminatory manner. He does not allege facts showing any discriminatory use of peremptory challenges, such as the racial and gender make-up of the entire jury pool and details about the venire members excused for cause and dismissed by peremptory challenges. *See Medellin v. Dretke*, 371 F.3d 270, 278-79 (5th Cir. 2004) (petitioner did not make a *prima facie* case of racial or gender discrimination by only showing the number of peremptory challenges used by race and by gender, without showing the racial and gender makeup of the jury pool). He does not allege any legal basis for an objection.

Counsel was not ineffective for failing to raise a meritless argument. *See United States v.*

*Kimler*, 167 F.3d 889, 893 (5th Cir. 1999); *see also Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("counsel is not required to make futile motions or objections"). Petitioner has not shown that the state court's rejection of this claim was unreasonable.

## C.    Conduct of Victim's Family During Trial

Petitioner contends that counsel failed to object to Swindle's mother's outburst during trial that he was a cold-blooded murderer and to obnoxious noises by Swindle's brother during Petitioner's testimony. He also alleges that counsel failed to object when jurors talked with members of Swindle's family during breaks.

### 1.    *Outbursts during trial*

During Gant's testimony, the trial court addressed the trial audience as follows:

> I need whoever is in here, family members, if y'all can't control yourself, then you have to step outside. I know this is emotional. We just can't have people making outbursts, okay? I understand how sensitive and emotional this is, but if you don't think you can contain yourself, I have to ask you to step out.

(Doc. 10-8 at 75.) During Petitioner's testimony, the trial court apparently addressed a member of the audience as follows:

> Ma'am, I understand, but just -- if you cannot contain yourself -- I understand how hard and emotional this is. I do. But if you can't, you're going to have to step outside, okay?

(*Id*. at 152.)

The record does not show the nature of any outbursts or what was said and by whom. Nothing in the record shows that Swindle's mother called Petitioner a cold-blooded murderer, or that Swindle's brother made noises during Petitioner's testimony. The trial court addressed audience members and instructed them to either refrain from making outbursts or leave. Petitioner has not shown that an objection by counsel would have resulted in anything other than this admonishment.

28

He has not shown that the state court's rejection of this claim was unreasonable.

### 2. *Communication with jurors*

Petitioner's claims that members of Swindle's family spoke with jurors are not supported by the record. *See Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) ("[a]bsent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value"). Counsel was not ineffective for failing to raise a meritless or futile objection. *See Kimler*, 167 F.3d at 893; *Koch*, 907 F.2d at 527. He has not shown that the state court's rejection of this claim was unreasonable.

### D. <u>Detective Fuller's Testimony</u>

Petitioner contends that counsel failed to object Detective Fuller's false testimony that Petitioner stored his handgun under a mattress.

The Supreme Court has held that the presentation of false evidence at trial, as well as the admission into evidence at trial of unsolicited false evidence that is not corrected, violates a criminal defendant's due process rights if the reliability of a given witness may be determinative of guilt or innocence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). In order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, a petitioner must establish that: (1) the testimony was actually false; (2) the prosecution knew it was false; and (3) it was material. *Napue*, 360 U.S. at 271. Knowledge of falsity is attributed to the prosecutor as the spokesperson for the government. *Giglio v. United States*, 405 U.S. 150, 154 (1972). The Supreme Court has also stated that a new trial is dictated only when the false testimony could, in any reasonable likelihood, have affected the judgment of the jury. *Napue*, 360 U.S. at 271. Petitioner

does not identify anything in the record that shows that the testimony was false, and his claim is unsupported by the record. *See Ross*, 694 F.2d at 1011. He does not allege or show that the prosecutor knew the testimony was false. Contradictory testimony from witnesses, inconsistencies within a witness's testimony, and conflicts between a witness's testimony and prior statements or testimony of other witnesses do not establish perjury. *Koch*, 907 F.2d at 531; *United States v. Martinez-Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989). Conflicting testimony is to be resolved by the jury. *See Koch*, 907 F.2d at 531.

Petitioner has not shown a legal basis for an objection to Detective Fuller's testimony. Counsel was not ineffective for failing to raise a meritless or futile objection. *See Kimler*, 167 F.3d at 893; *Koch*, 907 F.2d at 527. Petitioner has not shown that the state court's rejection of this claim was unreasonable.

## E.   Witnesses Gayford and Parker

Petitioner contends that counsel failed to recall Gayford and Parker. He asserts that they testified that he hit Swindle when he took her cell phone, but that Knouse did not testify that he hit Swindle. He does not allege what Gayford and Parker's testimony would have been if counsel had recalled them as witnesses. *See Day*, 566 F.3d at 538. He has not shown that the state court's rejection of this claim was unreasonable.

## F.   Paralegal Janice Schwartz

Petitioner contends that counsel failed to subpoena a paralegal, Janice Schwartz, about a conversation that she recorded between Swindle and her lawyer. He claims that the lawyer encouraged Swindle to go to Petitioner's home.

Petitioner has not shown that Schwartz was available to testify. *Day*, 566 F.3d at 538.

Nothing in the record supports his assertion about the substance of Schwartz's potential testimony. *See Ross*, 694 F.2d at 1011. He has not shown that the outcome would have been different if she would have testified. Even if Swindle's attorney encouraged her to go to Petitioner's home, the undisputed evidence showed that Swindle did in fact go to Petitioner's home. He has not shown that the state court's rejection of this claim was unreasonable.

## G.    Expert Witnesses

Petitioner contends that counsel failed to call expert witnesses Gary Meyers and David Schwartz in support of the defensive theory.[1]

If counsel has made an adequate investigation, an informed decision based on trial strategy cannot be the basis for a claim of ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753 (5th Cir.2003), quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir.2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir.2002). Petitioner has not made this showing. He has not overcome the presumption of sound trial strategy in calling Dr. McClung as an expert witness and not using other expert witnesses. He has not shown what their testimony would have been or that it would have been beneficial to his defense. *Day*, 566 F.3d at 538. He has not shown that the state court's rejection of this claim was unreasonable.

## H.    Petitioner in Shackles

Petitioner contends that counsel failed to object to the jury being allowed to see that he was in shackles when he took the stand to testify.

The visible use of shackles during trial in the presence of the jury could undermine the

---

[1]Petitioner's notice of expert witnesses included Gary Mears, PhD., and David Swartz, M.D. (Doc. 10-4 at 32.)

presumption of innocence and the related fairness of the factfinding process. *Deck v. Missouri*, 544 U.S. 622, 630–31 (2005). It is not allowed unless the trial court determines that it is justified by an essential state interest specific to the defendant on trial. *Id*. at 629.

Nothing in the record shows that Petitioner was shackled or that the jury saw him in shackles. His claim is not supported by the record. *See*, 694 F.2d at 1011. Counsel was not ineffective for failing to raise a meritless or futile objection. *See Kimler*, 167 F.3d at 893; *Koch*, 907 F.2d at 527. He has not shown that the state court's rejection of this claim was unreasonable.

## I.    **Temporary Insanity**

Petitioner contends that counsel failed to present a defense of temporary insanity.

In Texas, it is an affirmative defense to prosecution that at the time of the conduct charged, a defendant did not know that his conduct was wrong as a result of a severe mental disease or defect. *See* Tex. Penal Code § 8.01(a). This defense excuses a person from criminal responsibility even though the State has proven every element of the offense beyond a reasonable doubt. *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). However, the existence of a mental illness alone is not sufficient to establish legal insanity. Instead, the defendant must have been mentally ill at the time of the offense to the point that he did not know his conduct was wrong. *Nutter v. State*, 93 S.W.3d 130, 132 (Tex. App–Houston [14th Dist.] 2001, no pet.).

Petitioner does not present any evidence, and the record does not show that he did not know that his conduct was wrong at the time of the offense as a result of a mental illness or defect. His conclusory claim does not entitle him to relief. *Woods*, 870 F.2d at 288 n.3; *Miller*, 200 F.3d at 282.

## J.    **Mental Illness and Diminished Capacity**

Petitioner contends that counsel failed to articulate that he was mentally ill at the time of the

offense and suffered from diminished capacity.

In Texas, there is no defense of diminished capacity other than the insanity defense under Section 8.01(a). *Ruffin*, 270 S.W.3d at 593. Evidence of a diminished capacity due to mental illness may be relevant to the issue of whether the defendant acted with the *mens rea* or culpable mental state necessary for an offense. *Id*. at 595.

Petitioner does not present any evidence, and the record does not show, that he was unable to act with the culpable mental state for the offense murder as a result of a mental illness. His conclusory claim does not entitle him to relief. *Woods*, 870 F.2d at 288 n.3; *Miller*, 200 F.3d at 282. He has not shown that the state court's rejection of this claim was unreasonable.

### K.     Application for Probation

Petitioner contends that counsel failed to have him verify his application for probation.

Because Petitioner was convicted of murder, he was ineligible for probation. *See* Tex. Code Crim. Proc. art. 42.12, § 4(d)(8) (a defendant is not eligible for probation from the jury if convicted of an offense under Tex. Penal Code § 19.02 (murder)). Because he was not eligible for it, he has not shown that he was prejudiced by the failure to have him verify his application for probation. He has not shown that the state court's rejection of this claim was unreasonable.

### L.     Jury Instructions - Unanimity

Petitioner contends that counsel failed to object to the jury instructions for not requiring unanimity on the issue of sudden passion.

At the punishment phase, the jury was instructed on the issue of whether he acted in sudden passion, among other issues. (Doc. 10-4 at 50.) The last paragraph of the jury instructions informed the jury that "[y]our verdict must be unanimous." Because the jury instructions required unanimity

33

on all punishment issues, including the issue of sudden passion, an objection regarding unanimity in the jury instructions would have lacked merit. Counsel was not ineffective for failing to raise a meritless or futile objection. *See Kimler*, 167 F.3d at 893; *Koch*, 907 F.2d at 527. Petitioner has not shown that the state court's rejection of this claim was unreasonable.

## M.     Misdemeanor Offense

Petitioner contends that counsel failed to object to the prosecutor's distortion of the facts about a prior Arizona misdemeanor offense relating to a car fire.

In answer to the prosecutor's question, Dr. McClung testified that Petitioner had previously been convicted for pouring gasoline on a car of a former girlfriend. (Doc. 10-9 at 90-91). The prosecutor asked whether Petitioner tried to light the gasoline. Petitioner had told Dr. McClung that he just poured the gasoline on the car. (*Id*. at 91.) While cross-examining witness Cindy Martinez, one of Petitioner's co-workers, the prosecutor asked if she was aware that Petitioner had once set a former girlfriend's car on fire. (*Id*. at 117.) The trial court sustained defense counsel's objection that the question was a mischaracterization of the evidence. (*Id*.)

Petitioner does not explain how the prosecutor distorted the facts about a prior offense. His conclusory claim does not entitle him to relief. *Woods*, 870 F.2d at 288 n.3; *Miller*, 200 F.3d at 282. To the extent that he is complaining about the prosecutor's question to Martinez, counsel did object, and the objection was sustained. He has not shown that the state court's rejection of this claim was unreasonable.

In conclusion, Petitioner has not shown that counsel rendered ineffective assistance.

## V.  TRIAL COURT ERROR

In his second ground, Petitioner contends that the trial court erred in various instances.

34

A.    **Conduct of Victim's Family During Trial**

Petitioner contends that the trial court erred by allowing the victim's family to make outbursts during his testimony.

The record does not show that the trial court allowed the victim's family to make outbursts. As discussed, the trial court admonished the trial audience twice about outbursts. The record does not show the nature of the outbursts or what was said and by whom. He has not shown that the state court's rejection of this claim was unreasonable.

B.    **Excusing a Prospective Juror**

Petitioner contends that the trial court excused a prospective juror because of non-refundable airplane tickets.

Petitioner does not identify any prospective jurors who were excused on this basis, or any constitutional right that was violated. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (in conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004) (the correctness of the state court's interpretation of state law is beyond the scope of federal habeas review). During voir dire, the court asked who had non-refundable plane tickets, and two jurors said that they did. (Doc. 10-6 at 54, 56.) One of them was not identified in the record. The other prospective juror was identified in the record and did not serve on the jury; she said that she could not be fair and impartial. (*Id*. at 188.) The record does not show that the jurors were excused because of their non-refundable tickets.

Moreover, in Texas, a prospective juror may be excused for economic reasons if the parties are present and approve the release of the prospective juror. Tex. Gov't Code § 62.110(c). The

parties were present during jury selection, and the record shows that 29 prospective jurors were excused with the agreement of the parties. (Doc. 10-6 at 194.) There were no objections. If any of those 29 excused prospective jurors were excused based on non-refundable tickets, there was no error. He has not shown that the state court's rejection of this claim was unreasonable.

**C.      Juror Questionnaire**

Petitioner contends that the trial court erred in overruling his objection to Question 5 on the juror questionnaire.

Although Petitioner refers to Question 5, the trial court overruled his objection to Question 3. It asked, "Do you have any moral or personal briefs that would prevent you from sitting in judgment of another human being?" (Doc. 10-6 at 10.) A prospective juror may be challenged for cause for an inability to sit in judgment of another person based on a religious belief. *Booker v. State*, No. 10-16-00169-CR, 2017 WL 652584 at *3-4 (Tex. App.–Waco Feb. 15, 2017, no pet.).

Petitioner does not identify any constitutional right that was violated. He has not shown that it was error to ask about a matter that can be the basis of a challenge for cause. He has not shown that the state court's rejection of this claim was unreasonable.

**D.      Prospective Juror's Definition of Reasonable Doubt**

Petitioner contends that the trial court erred in overruling his objection to a prospective juror defining the law of the case.

During voir dire, a prospective juror stated what he thought "reasonable doubt" meant. (Doc. 10-6 at 105.) Defense counsel objected to the prospective juror defining the law. (*Id.*) The court overruled the objection, observing that the prospective jurors were giving their opinions on how reasonable doubt operated. (*Id.* at 105-06.) The court explained to the jury that reasonable doubt

is a doubt based on reason and common sense.  (*Id*. at 106.)  The record does not show that the prospective juror was defining the law.  Petitioner has not shown that the trial court erred in overruling the objection, or that the state court's rejection of this claim was unreasonable.

**E.      911 Call from Victim**

Petitioner contends that the trial court erred in overruling his hearsay objection to the 911 call from Swindle and in ruling that her statement during the call was a dying declaration.

Petitioner objected to a tape of Swindle's 911 call as hearsay and a violation of the Confrontation Clause.  (Doc. 10-6 at 206-07.)  The court overruled the objections.  (*Id*. at 207-08.) To the extent he complains that the taped call was hearsay, a trial court's evidentiary rulings are matters of state law which are not subject to re-examination by the federal courts.  *See McGuire*, 502 U.S. at 67–68.  "[A] federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair."  *Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997). He has not shown that the tape of the 911 rendered his trial fundamentally unfair.[1]

Petitioner has not shown that the state court's rejection of this claim was unreasonable.

**F.      Autopsy Photographs**

Petitioner contends that the trial court erred in overruling his objection to the admission of autopsy photographs.

---

[1]Petitioner does not raise a federal habeas claim regarding the Confrontation Clause, but he did object on that basis at trial.  To the extent that his claim may be construed as raising a Confrontation Clause issue, it lacks merit.  The state court could have reasonably determined that Swingle's 911 call reported about events that were actually happening and she was seeking emergency assistance.  *See Davis v. Washington*, 547 U.S. 813, 822, 827 (2006) (if the caller is reporting about current circumstances and is seeking emergency assistance, then the statements are not testimonial and do not violate the Confrontation Clause); *see also Barthelemy v. Cain*, 639 F. Appx. 225, 227 (5th Cir. 2016) (statements in 911 call did not violate the Confrontation Clause, because they were made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation was to enable police to meet an ongoing emergency).

The court admitted into evidence the autopsy photographs and overruled Petitioner's objection that they were unfairly prejudicial. The court's evidentiary ruling under state law is not a matter for federal habeas review. *Gochicoa*, 118 F.3d at 446. Petitioner has not shown that the admission of the autopsy photographs into evidence rendered his trial fundamentally unfair, or that the state court's rejection of this claim was unreasonable.

**G.    Swindle's Threat to Gant**

Petitioner contends that the trial court erred by excluding Gant's testimony about a death threat Swindle made to her in a phone conversation.

Although the court initially sustained the State's objection to Gant's testimony about a death threat made by Swindle to Gant during a phone conversation in 2009 (doc. 10-8 at 82-85), the court later permitted Gant to testify about that conversation and the threat (doc. 10-9 at 10, 14-15.) Any error in initially excluding the evidence was rendered harmless when the court later allowed the evidence. He has not shown that the state court's rejection of this claim was unreasonable.

**H.    Jury Instruction on Self-Defense, Defense of a Third Person, and Necessity**

Petitioner contends that the trial court erred in overruling his request for a jury instruction on self-defense, defense of a third person, and necessity.

A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the use or attempted use of unlawful force. Tex. Penal Code Ann. § 9.31(a). The use of force against another is not justified in response to verbal provocation alone. § 9.31(b).

A person is justified in using deadly force against another if the use of force against another would be justified under § 9.31(a), and when and to the degree the actor reasonably believes the

deadly force is immediately necessary to protect the actor against the use or attempted use of unlawful deadly force or to prevent the imminent commission of aggravated kidnaping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. Tex Penal Code § 9.32(a). "Deadly force" means "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." Tex. Penal Code § 9.01(3).

The actor's belief that the deadly force was immediately necessary is presumed to be reasonable if the actor (1) knew or had reason to believe that the person against whom the deadly force was used unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, (2) did not provoke the person against whom the force was used, and (3) was not otherwise engaged in criminal activity. Texas Penal Code § 9.32(b).

A person is justified in using deadly force against another to protect a third person if (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under § 9.32 in using deadly force to protect himself against the unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect, and (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person. Tex. Penal Code § 9.33.

### 1. *Defense of a third person*

Petitioner raised a claim on direct appeal regarding the lack of a jury instruction on defense of a third person. The state appellate court held that he was not entitled to such an instruction. *Gillam*, at *17-18. Swindle was not Petitioner's property, and she was not using any type of force against anyone, when she was shot. There was no evidence that Swindle had a weapon or that Gant was outside the house during the incident. The threats against Gant were allegedly made during the

39

prior year and were too remote to create an immediate danger. The use of force would not have been justified in response to a verbal provocation alone. The appellate court concluded that there was no evidence that Petitioner reasonably believed that his intervention was immediately necessary to protect Gant. *Id.* at 18. He has not shown that the state court's rejection of this claim was unreasonable.

### 2.    *Self-defense*

Petitioner also raised an issue on appeal about the lack of a jury instruction on self-defense. The appellate court held that he failed to preserve the issue for appeal because he did not request an instruction. *Id.* at 17.

Under Texas' contemporaneous objection rule, a party must make a timely objection with specific grounds for the desired ruling to preserve an issue for appellate review. *Cubas v. Thaler*, 487 F. Appx 128, 130 (5th Cir. 2012) (citing *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir.1997)). A procedural default premised on the petitioner's failure to comply with the Texas contemporaneous objection rule constitutes an adequate and independent bar to federal habeas review. *See Scheanette v. Quarterman*, 482 F.3d 815, 823 (5th Cir. 2007) ("[w]e have recognized a federal petitioner's failure to comply with the Texas contemporaneous objection rule as an adequate and independent state procedural barrier to federal habeas review"); *Rowell v. Dretke*, 398 F.3d 370, 374–75 (5th Cir. 2005) (finding that a Texas petitioner's failure to timely object to alleged errors in a jury charge, barred federal habeas relief of the allegedly erroneous jury charge under the procedural default doctrine). The procedural default of a state defendant who fails to comply with the contemporaneous objection rule precludes federal habeas review of the claim absent a showing of cause and prejudice. *Wainwright v. Sykes*, 433 U.S. 72, 87(1977); *see also Nichols v. Scott*, 69

F.3d 1255, 1280 (5th Cir. 1995). Petitioner's claim regarding a jury instruction on self-defense is procedurally barred, and he has not alleged or shown cause and prejudice. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("where . . . the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits").

Additionally, his claim regarding a self-defense instruction lacks merit for the same reasons as his claim regarding an instruction on defense of a third person. There was no evidence that Swindle was using force or that she had a weapon.

### 3.    *Necessity defense*

Petitioner asserts that he was entitled to instructions on the use of deadly force to protect himself and Gant. When the use of deadly force in self-defense is the conduct that is allegedly immediately necessary under the necessity defense, the defense of necessity does not apply, and any entitlement to a jury instruction is determined by section 9.32 (self-defense) or section 9.33 (defense of a third person). *See Whipple v. State*, 281 S.W.3d 482, 503 (Tex. App.–El Paso 2008, pet. ref'd). He has not shown that the state court's rejection of this claim was unreasonable.

## I.    <u>Evidence of Swingle's Past Conduct</u>

Petitioner contends that the trial court erred by excluding evidence regarding the reason Swingle went to prison, her history of drug abuse, and her consorting with violent felons.

Petitioner raised this claim on appeal, and the state appellate court found that this evidence was presented at trial. There was evidence that Swindle went to prison on a drug charge; that she self-reported drug use while on probation, her alcohol issues, episodic use of cocaine, and abuse of prescription medication; and that she was with a convicted felon when she was arrested for public

lewdness.  Any exclusion of that evidence was harmless, since it was ultimately admitted.  *See Gillam*, at \*12 n.3.  He has not shown that the state court's rejection of this claim was unreasonable.

**J.**    **Dr. McClung**

Petitioner contends that the trial court erred by not allowing testimony of Dr. McClung, a clinical psychologist in the guilt-phase to show his state of mind under article 38.36(b)(2) of the Texas Code of Criminal Procedure.

Petitioner raised this claim on appeal. In a murder case in which self-defense is raised, article 38.36(b)(2) authorizes the admission of relevant expert testimony regarding the condition of the mind of the defendant at the time of the offense if the defendant had been a victim of family violence as defined in the family code committed by the deceased.  The appellate court held that Dr. McClung's testimony was not admissible under article 38.36 because there was no evidence that Petitioner had been the victim of acts of family violence committed by Swingle. *See Gillam*, at \*11-12.  He has not shown that the state court's rejection of this claim was unreasonable.

**K.**    **Jury Instruction on Involuntary Intoxication**

Petitioner contends that the trial court erred in granting the State's request for a jury instruction on voluntary intoxication because there was no evidence that he was intoxicated.

To warrant habeas relief for a violation of due process due resulting from an error in the trial court's instructions to the jury, the court must find that the jury charge error rendered the entire trial fundamentally unfair.  *See Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154–55 (1977)).  The question is whether the alleged invalid instruction "by itself so infected the entire trial that the resulting conviction violated due process, not merely if the instruction was undesirable, erroneous, or universally condemned." *Wright v.*

42

*Director*, TDCJ, No. 9:11–CV–204, 2012 WL 7159911, at * 20 (E.D. Tex. Oct. 2, 2010) (citing

*Henderson*, 431 U.S. at 155)), *rep. and rec. adopted*, 2013 WL 607850 (E.D. Tex. Feb. 19, 2013).

Petitioner has not shown that the instruction on voluntary intoxication rendered the trial

fundamentally unfair and violated due process.  He has not shown that the state court's rejection of

this claim was unreasonable.

**L.    Contradictory Paragraphs in Jury Instructions**

Petitioner contends that the trial court erred by submitting jury instructions in which two

paragraphs were contradictory, referring to the first two paragraphs on page 3 of the instructions.

(Doc. 10-4 at 47.)  He does not explain how the paragraphs are contradictory.  His conclusory claim

does not entitle him to relief.  *Woods*, 870 F.2d at 288 n.3; *Miller v. Johnson*, 200 F.3d at 282.

**M.    Unanimity on Issue of Sudden Passion**

Petitioner contends that the trial court erred by failing to instruct the jury that unanimity was

required on the issue of sudden passion.

As discussed, the jury instructions required a unanimous verdict at the guilty-phase.  He has

not shown that the state court's rejection of this claim was unreasonable.

**N.    Sufficiency of Evidence – Sudden Passion**

Petitioner contends that the trial court erred by failing to enter a judgment in his favor on the

issue of sudden passion, notwithstanding the jury's verdict.   He essentially challenges the

sufficiency of the evidence supporting the jury's verdict that he did not act in sudden passion.

Under Texas law, challenges to the sufficiency of the evidence of a conviction must be raised

on direct appeal.  *See Ex parte McLain*, 869 S.W.2d 349, 350 (Tex. Crim. App. 1994) (holding

evidentiary sufficiency claims not cognizable in post-conviction, collateral attack); *West v. Johnson*,

92 F.3d 1385, 1389 n. 18 (5th Cir. 1996) (recognizing that this is a long-standing legal principle under Texas law).  On appeal, the appellate court determined that the evidence was sufficient regarding lack of sudden passion.  *Gillam*, at *15.  Swindle had no weapon.  There was testimony that Petitioner approached the vehicle in which she was sitting and wrestled with her over a cell phone.  He walked into his house, came out a short time later, walked toward Swindle, and began shooting.  Swindle was not attacking him and did not appear to pose a threat to him at the time. Petitioner shot Swindle while she was standing, then shot her several more times after she fell to the ground. There was no evidence that Gant was outside the house during this time.  *Id*.

Petitioner did not raise the issue in his PDR, (doc. 10-12), but he raised it again in his state habeas application.  (Doc. 10-14 at 14.)  The Texas Court of Criminal Appeals denied it without written order.  That decision was an adjudication on the merits.  *See Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).  When the Court of Criminal Appeals denies a state application for writ of habeas corpus without written order, it implicitly denies sufficiency claims on the procedural basis that such claims are not cognizable on state habeas review.  *See Ex parte Grigsby*, 137 S.W.3d 673, 674 (Tex. Crim. App. 2004).  When the last state court to review a claim clearly and expressly states that its judgment rests on a procedural bar, the procedural default doctrine generally bars federal review.  *See Harris v. Reed*, 489 U.S. 255, 262 (1989); *Lowe v. Scott*, 48 F.3d 873, 875 (5th Cir. 1995).

Petitioner has procedurally defaulted any claim of insufficiency of the evidence under Texas law.  This default constitutes an adequate and independent state procedural ground to bar federal habeas review of the claim.  *See Reed v. Thaler*, 428 F. App'x 453, 454 (5th Cir. 2011) (citing *Busby v. Dretke*, 359 F.3d 708, 724 (5th Cir. 2004), and *Ex parte Grigsby*, 137 S.W.3d at 674).  The claim

44

is therefore procedurally barred unless Petitioner shows cause and prejudice or a fundamental miscarriage of justice. *See Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir. 2000). He has not shown cause and prejudice, and he has not shown a fundamental miscarriage of justice or actual innocence.

Petitioner has also not shown that his claim has merit. Federal courts conduct an extremely limited review of habeas claims based on the sufficiency of the evidence using the standard in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Jackson* held that the correct standard of review when a state prisoner challenges the sufficiency of the evidence in a federal habeas corpus proceeding is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 320. Moreover, the trier of fact has the responsibility of weighing the evidence, resolving conflicts in testimony, and drawing reasonable inferences from basic facts to ultimate facts. *Id*. Under *Jackson*, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). "Determining the weight and credibility of the evidence is within the sole province of the jury." *United States v. Martinez*, 975 F.2d 159, 161 (5th Cir. 1992). Courts view "any required credibility determinations in the light most favorable to the guilty verdict." *United States v. Wise*, 221 F.3d 140, 154 (5th Cir. 2000). They do not "second-guess[ ] the weight or credibility given the evidence." *United States v. Ramos–Garcia*, 184 F.3d 463, 465 (5th Cir. 1999). He has not shown that he is entitled to relief on this claim.

## VI. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In his third ground, Petitioner claims that his appellate counsel was also ineffective.

The federal constitution also guarantees a criminal defendant the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Whether appellate counsel has been

ineffective is also determined by using the standard enunciated in *Strickland*, and the movant must show a reasonable probability that he would have prevailed on his appeal but for counsel's deficient representation. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).

To render effective assistance of counsel, appellate counsel need not raise every non-frivolous issue on appeal. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). "Instead, to be deficient, the decision not to raise an issue must fall 'below an objective standard of reasonableness.' " *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000) (quoting *Strickland*, 466 U.S. at 688). "[A] reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *Williamson*, 183 F.3d at 462–63 (footnote and citations omitted). To determine whether appellate counsel was deficient, courts must consider whether the challenge "would have been sufficiently meritorious such that [counsel] should have raised it on appeal." *Phillips*, 210 F.3d at 348.

**A.**     **Article 38.36; Specific Testimony**

Petitioner contends that appellate counsel failed to discuss Article 38.36 of the Texas Code of Criminal Procedure and failed to identify specific testimony that was excluded regarding his fourth ground on appeal.

Petitioner's fourth ground on appeal contended that the trial court erred in excluding testimony about Swindle's behavior. The appellate court noted that Petitioner cited to, but did not discuss, article 38.36. *Gillam*, at *12. That court further noted that Petitioner did not identify specific testimony that was excluded. *Id*. Nevertheless, it addressed the merits of the claim and held that there was no error, regardless of the authority cited by Petitioner. The court determined that

46

testimony regarding those matters was presented at trial, including matters not specifically identified by Petitioner on appeal. *Id*. at n.3. Because the appellate court addressed the matters about which he complains, Petitioner has not shown that he was prejudiced. He has not shown that the state court's rejection of this claim was unreasonable.

**B.    Self-defense**

Petitioner contends that appellate counsel failed to determine that trial counsel requested an instruction on defense of a third person, but not on self-defense. The appellate court held that he failed to preserve error regarding the lack of an instruction on self-defense because trial counsel did not request an instruction. He has not shown how he was prejudiced by counsel's arguing an unpreserved issue on appeal, or that the state court's rejection of this claim was unreasonable.

**C.    Dr. McClung's Testimony**

Petitioner contends that counsel failed to cite to the record and show how the arguments pertained to the exclusion of Dr. McClung's testimony.

The appellate court addressed the merits of Petitioner's ground regarding Dr. McClung's testimony and found no error. *Id*. at *11-12. Petitioner has not shown how he was prejudiced. He has not shown that the state court's rejection of this claim was unreasonable.

**VII.  IMPROPER JURY ARGUMENT**

Petitioner's fourth ground alleges that the prosecutor made improper jury arguments.

Under Texas law, a proper jury argument includes (1) summation of the evidence presented at trial; (2) reasonable deductions drawn from that evidence (3) response to opposing counsel's argument; and (4) pleas for law enforcement. *See Cobble v. State*, 871 S.W.2d 192, 204 (Tex. Crim. App. 1993). In habeas corpus proceedings, allegedly improper statements are reviewed to determine

whether they "'so infected the [trial] with unfairness as to make the resulting [conviction] a denial

of due process.'" *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Ables v. Scott*,

73 F.3d 591, 592 n. 2 (5th Cir. 1996) (internal quotation omitted). The alleged conduct must render

the trial fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth

Amendment. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether

the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction

a denial of due process") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). "Such

unfairness exists only if the prosecutor's remarks evince either persistent and pronounced

misconduct or ... the evidence was so insubstantial that (in probability) but for the remarks no

conviction would have occurred." *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir.2008)

(quoting *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir.2002)).

## A.   Cat and Mouse Games

Petitioner contends that the prosecutor interjected her opinion in closing argument by stating

that the jury should not get "caught up" in his "cat and mouse" games.

Petitioner's counsel referred to a "cat and mouse" game during closing argument. (Doc. 10-9

at 42.) The prosecutor responded to the argument. (*Id*. at 46.) He has not shown that the prosecutor

erred, or that the state court's rejection of claim was unreasonable.

## B.   Petitioner's Potential Reaction to Sudden Passion Verdict

Petitioner contends that the prosecutor argued that if the jury found that he acted in sudden

passion, he would say that he committed murder, that Dallas County did not care, and that he

received the minimum sentence. (Doc. 10-9 at 131.)

The state court could have reasonably determined that the argument was a proper plea for

48

law enforcement.  He has not shown that the state court's rejection of this claim was unreasonable.

### VIII.  DUE PROCESS VIOLATION – COMMUNICATION WITH JURORS

In his fifth ground, Petitioner contends that his right to due process was violated when Swingle's family talked with jurors.  As discussed, the record does not show that members of Swindle's family spoke with jurors.  He is not entitled to relief on this unsupported claim.  *See Ross*, 694 F.2d at 1011.  He has not shown that the state court's rejection of this claim was unreasonable.

### IX.  EVIDENTIARY HEARING

Upon review of the pleadings and the proceedings held in state court as reflected in the state court records, an evidentiary hearing appears unnecessary.  Petitioner has not shown he is entitled to an evidentiary hearing.

### X.  RECOMMENDATION

The petition for habeas corpus relief under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

**SO RECOMMENDED** this 14th day of July, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

49

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

50